# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 21, 2013 Session

## STATE OF TENNESSEE v. DANIEL WARD

**Appeal from the Criminal Court for Campbell County**
**No. 14348    E. Shayne Sexton, Judge**

---

**No. E2012-01419-CCA-R3-CD - Filed September 4, 2013**

---

The defendant, Daniel Ward, appeals his Campbell County Criminal Court jury convictions of 10 counts of aggravated sexual battery, claiming that the evidence was insufficient to support his convictions, that the bill of particulars was inadequate, that his pretrial statement to police was not voluntarily and knowingly given, and that the 54-year sentence imposed by the trial court was excessive.  Because the evidence was insufficient to support the defendant's conviction of aggravated sexual battery in count six, that conviction is reversed, and the charge is dismissed.  The remaining judgments of the trial court are affirmed.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Reversed and Dismissed in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Wesley L. Hatmaker, Jacksboro, Tennessee, for the appellant, Daniel Ward.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; William Paul Phillips, District Attorney General; and Scarlett W. Ellis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The convictions in this case are the result of events involving the defendant and his wife's niece, C.M.[1]  At trial, C.M. testified that the defendant was married to her aunt, Melissa, whom she called "Sissy."  C.M. said that she visited the couple's residence during

---

[1]In keeping with the policy of this court, we refer to the minor victim by her initials.

her free time to help her aunt, who was confined to a hospital bed as a result of her battle with lupus and "couldn't do anything for herself." She recalled that on one occasion just before Christmas when she was 10 years old and in the fourth grade, the defendant touched her "breast area and . . . private area" over her clothes while showing her how to use the computer. She said that the defendant told her "that it should . . . be kept between" the two of them.

C.M. testified that just before her 11th birthday and when she was in the fourth grade, her aunt asked her to help with the laundry, and the defendant touched her breasts and vaginal area over her clothes while she was in the laundry room getting clothes out of the dryer. C.M. recalled that on a Friday evening when she was in the fourth grade, she complained to her aunt that she felt ill, and her aunt suggested that she go to the grocery store with the defendant to see if she could find any food that appealed to her. C.M. said that she agreed, and the defendant touched her vaginal area over her clothes as he drove to the store. On another occasion when she was in the fourth grade, the defendant touched her breasts and vaginal area over her clothes while she talked to a friend on the telephone. She said that she ended her conversation and then pushed the defendant's hand away. She told the defendant no, and he said, "[J]ust this one time."

C.M. testified that during the summer after she completed fourth grade, she planned to go camping with her family for her brother's birthday, which was in June. She said that her aunt became angry because she did not want C.M. to leave. C.M. said that when she went into the living room to wait for her parents, the defendant followed and joined her on the couch. She recalled that as they sat talking, the defendant touched her vaginal area over her clothes while rubbing his penis through his pants.

C.M. testified that when she was in the fifth grade and 12 years old, she was on the computer attempting to send an email to her brother when the defendant sat down beside her and "started touching [her] breasts and [her] vagina." The victim said that on another occasion when she was in the fifth grade and just after she had started wearing a bra, the defendant touched her breasts and "tried to go up under [her] shirt under [her] bra." She recalled that the defendant did not actually touch her skin because she "got up and left." The victim testified about another incident that occurred when she was in fifth grade. She said that when the defendant returned from an evening of hunting, he "grabbed [her] hand and tried to make [her] touch his penis." She said that she jerked her hand away and did not touch his penis. The victim testified that during the summer following fifth grade, she was cleaning her aunt's house in preparation for a sleepover with her friend when the defendant came behind her and rubbed her breasts and vaginal area over her clothes. C.M. testified that the defendant last attempted to touch her breasts just after her 16th birthday. She said that as he passed her in the dining room, he tried to touch her breast and vagina, but she batted

his hand away.

C.M. said that she did not report the abuse to her aunt because she feared that the stress of such a revelation would compromise her aunt's already fragile health. After her aunt died, the victim told her best friend about the abuse. She was in the 10th grade. C.M. said that she then told her grandmother, who contacted police.

During cross-examination, C.M. acknowledged that she related only two incidences of touching during her forensic interview and that she gave another statement saying that all the incidences of touching were confined to the defendant's house. She admitted that she did not provide a final statement relating all the alleged incidences of abuse until after the defendant had been indicted. C.M. conceded that she was similar in size to her aunt and that she often wore her aunt's clothing when she visited. C.M. maintained that the defendant did not ever touch her while she was in bed with her aunt. C.M. denied that she made the allegations because she was angry with the defendant for remarrying.

Don Farmer, former Chief Deputy for the Campbell County Sheriff's Department, testified that he telephoned the defendant, who was at that time working as a deputy sheriff, and asked him to come to the jail at the request of Tennessee Bureau of Investigation ("TBI") Agent Steve Vinsant. Deputy Farmer said that after the defendant arrived, Deputy Farmer escorted him to the "officer's room" of the jail, where Agent Vinsant was waiting. Deputy Farmer said that he stayed for only a few minutes at the beginning of the defendant's interview and then left. He testified that when he returned later, he observed Agent Vinsant read to the defendant a handwritten statement prepared by Agent Vinsant. Deputy Farmer said that the defendant agreed that the statement was his and, after signing the statement, turned to Deputy Farmer and said, "'Well, Don, everybody makes a mistake.'"

TBI Agent Steve Vinsant testified that he provided *Miranda* warnings to the defendant and that the defendant signed a written waiver of his constitutional rights. Agent Vinsant said that after waiving his rights, the defendant gave a statement that Agent Vinsant wrote down. Agent Vinsant said that after transcribing the statement, he read the statement aloud to the defendant, who then adopted it as his own by signing it. Agent Vinsant read the statement to the jury:

> My name is Daniel Ward. I live at 596 Chambers Road, Apartment 4 in Jacksboro, Tennessee. The first time I ever touched [C.M.'s] vagina and breasts, she was about 11 years old. From the first time until the last time which was in January or February of this year, I touched her on the vagina and breasts at least 12 times. I did this because I was frustrated. I could not

have sex with my wife. When [C.M.] says that I touched her vagina and breasts, that is true. It is not true that I masturbated in front of her. She may have walked into my spare bedroom and seen me masturbating and I did not know it. I never had sex with [C.M.]. I never penetrated her with my finger. I have never seen her naked.

I gave [C.M.] money for doing chores, not for letting me touch her. [C.M.] would not say anything when I would touch her. When I talked to [C.M.] on the phone, I knew it was being recorded. When I told her that I did not know why I did it and that sometimes people make mistakes, I knew she was talking about when I would touch her.

Agent Vinsant testified that he recorded two telephone calls between C.M. and the defendant. The second of those recorded conversations was played for the jury. During that conversation, the defendant told C.M. that "everybody makes mistakes."

During cross-examination, Agent Vinsant admitted that the defendant told him "of one incident where he jumped into bed and mistook [C.M.] for his wife." Agent Vinsant said that that incident was not included in the written statement because the defendant mentioned it at the beginning of the interview and did not bring it up again. Agent Vinsant denied picking and choosing details to include in the statement and said that he gave the defendant the option of writing his own statement. Agent Vinsant maintained that the defendant's statement did not refer to the defendant's claim of "mistaken identity."

At the conclusion of Agent Vinsant's testimony, the State rested. The defendant moved for a judgment of acquittal, and the State conceded that it had failed to present sufficient proof of counts 11, 12, 13, 14, and 16. In addition, the State conceded that it had failed to present proof of a completed crime in count 15 and asked the trial court to modify the charge to the lesser included offense of attempted sexual battery. The trial court granted the defendant's motion to dismiss counts 11, 12, 13, 14, and 16 and modified count 15 to a charge of attempted sexual battery. The court declined to dismiss the remaining counts.

The defendant testified that he was married to C.M.'s aunt Melissa for 13 years before she died on May 8, 2009, from lupus and related medical problems. The defendant said that although Melissa's medical condition confined her to bed for "certain times," she was not completely bedridden and cared for herself while he worked. He said that although she occasionally slept in a hospital bed that they had purchased following a surgery, his wife

-4-

slept in the marital bed "the biggest part of the 13 years we was together." The defendant said that C.M. visited the couple's home because she liked staying there. The defendant acknowledged that C.M. helped care for her aunt when she visited.

The defendant testified that during one of those overnight visits, he returned home from work late, got into the bed, and began touching C.M. on her breast and vaginal area, believing her to be his wife. The defendant said that it was dark, that C.M. was wearing his wife's clothes, and that he did not know that C.M. was visiting on that night. The defendant admitted that he touched C.M. approximately 12 times before he realized it was not his wife. He testified that after he realized he had been touching C.M., he got out of bed and went to sleep on the couch. The defendant denied touching C.M. on any other occasion.

The defendant maintained that he did not tell Agent Vinsant that he was sexually frustrated and insisted that he and his wife had a normal sex life until shortly before her death. He said that he provided the statement to Agent Vinsant because, as a police officer himself, he wanted to assist in their investigation. The defendant said that he signed the statement written by Agent Vinsant because he "trusted that" the statement referred to the incident of mistaken identity and was not an admission of 10 to 12 separate incidences of touching.

The defendant testified that when he told C.M. that "people makes mistakes," he was "referring to the night" that he mistook C.M. for his wife and not to years of sexual abuse. The defendant said that C.M. only came forward with the allegations after finding out that his girlfriend, whom he had married prior to trial, was pregnant in November 2009.

During cross-examination, the defendant denied telling Agent Vinsant that he started touching C.M. when she was 11. The defendant said that he did not recall the statement's being read to him. He insisted that parts of the written statement had been fabricated by Agent Vinsant.

At the conclusion of the defendant's testimony, the defense rested. The jury convicted the defendant as charged of aggravated sexual battery in counts one through 10 but acquitted him of the charge of attempted sexual battery in count 15.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence, the adequacy of the bill of particulars filed by the State, the denial of his motion to suppress the statement given to Agent Vinsant, and the propriety of the sentence imposed by the trial court. We consider each claim in turn.

-5-

*I. Sufficiency*

The defendant contends that his conviction of aggravated sexual battery in count nine should be dismissed because the State failed to establish "'unlawful sexual contact' in attempting to prove the ninth incident of aggravated sexual battery" and that the "remaining counts must be dismissed because of the inconsistencies of the alleged victim's testimony." The State concedes that the evidence was insufficient to support the defendant's conviction in count six but asserts that the evidence was sufficient to support each of the remaining convictions of aggravated sexual battery.

We review the defendant's challenge to the sufficiency of the evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Aggravated sexual battery, as relevant to this case, is the "unlawful sexual contact with a victim by the defendant or the defendant by a victim [when] . . . [t]he victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Additionally, "'[i]ntimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

In this case, C.M. testified about nine separate incidences of the defendant's touching her breasts and vaginal area over her clothes. We have prepared a chart that aligns the victim's testimony with the State's election as to the various counts of the indictment:

| Count | Election | Testimony |
|---|---|---|
| 1 | Just before Christmas 2003 when the defendant was helping her with a computer game | "I asked if I could use the computer and he said yes and then he would show me how it worked and while he was showing me how it worked, he was touching my breast area and my private[.]" |
| 2 | When the victim was in the fourth grade and on the telephone with a friend | "I was on the phone with [a friend] and I was sitting in the living room talking to her and [the defendant] walked in and . . . . started touching my vagina, and I told [her] that I had to go and I would talk to her Monday." |
| 3 | Just before her 11th birthday when she was getting clothes from the dryer | "There was one time my aunt had washed clothes and she wanted me to put them in the dryer so I did, and [the defendant] had clothes in the washer and we were both in . . . the laundry room checking our clothes, and he touched me in the same places as before." |
| 4 | While she was in the fourth grade and she and the defendant were driving to the store | "[The defendant] was going to the store, and she wanted me to go with him to see if there was anything that I wanted while he was there and so, on the ride up to the store, he was touching my vagina while we were in the car." |
| 5 | Just after her 11th birthday when the defendant gave her $20 as a gift | "After Sissy gave me the necklace for my 11th birthday, I was going into the dining room to put it up and [the defendant] was in there, and he gave me $20.00, I'm guessing for my birthday, . . . and I . . . walked out of the dining room to go talk to my aunt about it and when I walked back in there to put the necklace and the money up, he touched my breasts and vagina." |
| 7 | During the summer before fifth grade while she was waiting to go on a camping trip for her brother's birthday | "My brother's birthday, it's in June, and my parents took a camping trip to Big South Fork for his birthday and they wanted me to go . . . . And I was sitting in the living room waiting on them to get there, and [the defendant] come in there and sat down beside me . . . and he started touching my breasts and my vagina." |

| 8 | When she was 12 years old and trying to send an email to her brother | "I was on the computer e-mailing my brother because he didn't live with me and my mom and my dad . . . and [the defendant] walked in the dining room and asked me if I needed help and said that he would help me, and he came and sat in the chair beside me. And at first, he was helping me e-mail my brother, but then he started touching my breasts and my vagina." |
|---|---|---|
| 9 | When she was in the fifth grade and had just started wearing a bra | "He was touching my boobs, and he tried to go up under my shirt under my bra. . . . I was sitting on the couch. . . . I was watching the Disney Channel." |
| 10 | During the summer of 2005 while she was cleaning house in preparation for a friend's arrival | "My friend Angela from school was going to stay and [the defendant] was leaving. . . . Sis told me I had to clean the house before she could come over and even spend the night so I was cleaning everything, you know. And . . . [the defendant] was putting his stuff by the door, and he came up behind me while I was cleaning the table and touched my breasts and my vagina." |

The bill of particulars filed by the State provided that count six occurred during the summer of 2004 in the living room of the defendant's residence, and the State elaborated during closing argument that count six was based upon the defendant's touching the victim as she sat on the couch watching the Disney Channel during the summer after she completed fourth grade. The victim did not provide any testimony that aligned with the election provided by the State. The victim did testify about an incident that occurred while she watched the Disney Channel, but she specified that this incident occurred during the summer after fifth grade when she had just started wearing a bra. That testimony aligned with the State's election in count nine. Consequently, the defendant's conviction of aggravated sexual battery in count six is reversed, and the charge is dismissed. We decline, as we must, the defendant's invitation to revisit the victim's credibility and conclude that the evidence adduced at trial adequately supports the remaining convictions.

## II. Bill of Particulars

The defendant next contends that the bill of particulars filed by the State in response to his motion was inadequate because it did not sufficiently narrow the time frames

for each offense. The State responds that the bill of particulars adequately narrowed the time frame for each offense and that the defendant failed to establish that the failure to further narrow the time frames inured to his prejudice.

"On defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." Tenn. R. Crim. P. 7(c). "The purpose of the bill of particulars is to provide information about the details of the charge when necessary for a defendant to prepare his or her defense, to avoid prejudicial surprise at trial, and to enable the defendant to preserve a plea of double jeopardy." *State v. Speck*, 944 S.W.2d 598, 600 (Tenn. 1997); *see also State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000); *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991). "Information that may be required in the bill of particulars includes, but is not limited to, details as to the nature, time, date, or location of the offense." *Speck*, 944 S.W.2d at 600 (citing *Byrd*, 820 S.W.2d at 741-42).

"Although a court should make every effort to see that the prosecution supplies critical information in the bill of particulars, . . . in cases involving child sexual abuse, the prosecution may be unable to supply specific dates on which alleged offenses occurred." *Speck*, 944 S.W.2d at 600. In those cases, a conviction will "'be affirmed if in the course of trial it does not appear that the defendant's defense has been hampered by the lack of specificity.'" *Id.* (quoting *Byrd*, 820 S.W.2d at 742). A conviction "must be reversed," however, "if trial testimony establishes that the [S]tate had in its possession, either actually or constructively, additional information that could have helped pinpoint the nature, time, or place of the offense, and withheld that information from the defendant." *Byrd*, 820 S.W.2d at 742. A "lack of specificity will not result in reversible error unless a defendant can prove prejudice." *State v. Sherman*, 266 S.W.3d 395, 409 (Tenn. 2008) (citing *Speck*, 944 S.W.2d at 601; *Byrd*, 820 S.W.2d at 741).

The defendant claims that the victim's trial testimony established that the State withheld information in its bill of particulars that would have further narrowed the time frame for each count in the indictment and that the State's failure to disclose this information hampered his defense. Other than a bare allegation that his defense was hampered and that he was unable to mount an alibi defense due to the lack of specificity in the bill of particulars, the defendant does not allege any specific prejudice stemming from the bill of particulars. Regarding his claim about an alibi defense, the defendant did not attempt to present any alibi proof following the State's proof even after he became aware of the more narrow time frames. Furthermore, he failed to establish at the hearing on the motion for new trial that, had he been aware of the more narrow time frames, he would have, in fact, presented an alibi defense. Even if the bill of particulars was inadequate, the defendant has failed to establish that he was prejudiced by that inadequacy. Consequently, he is not entitled

-9-

to relief on this issue.

## III. Defendant's Statement

The defendant avers that the trial court should have excluded the pretrial statement he provided to Agent Vinsant because "it was not knowingly and voluntarily given." Notably, the defendant does not contend that the statement was obtained in violation of his constitutional rights. Instead, the defendant argues that, in signing the statement handwritten by Agent Vinsant, he did not realize that he was admitting ongoing sexual abuse of the victim and instead believed that the statement referred to a single incident he related to the agent. Additionally, he contends that inconsistencies between the statement and the trial testimony of the defendant and the victim render the statement involuntary.

At the suppression hearing, Agent Vinsant testified that he asked Deputy Farmer to have the defendant come to the jail so that Agent Vinsant could inform the defendant of the allegations made by the victim. The defendant did as Deputy Farmer asked, and when the defendant arrived, Agent Vinsant informed him of the allegations and provided him with *Miranda* warnings. The defendant executed a waiver of his rights. Agent Vinsant said that when confronted with the allegations, the defendant provided a statement that Agent Vinsant wrote down. He testified that a decision was made prior to the interview that Deputy Farmer would not be present during the defendant's questioning so that the defendant would not feel compelled to make a statement as a condition of his employment. Agent Vinsant said that he had "a brief glimmer" of the defendant's relating a "case of mistaken identity" wherein he had mistaken the victim for his wife in the couple's marital bed. Agent Vinsant was adamant, however, that the "case of mistaken identity" did not relate to the defendant's admission that he had touched the victim 10 to 12 times.

Deputy Farmer testified that he asked the defendant to come to the jail at Agent Vinsant's request. Deputy Farmer said that he escorted the defendant to "the officer's room" and remained in the room during the "basic talk" portion of Agent Vinsant's interview. He then left the office and returned at the conclusion of the interview. At that point, he heard Agent Vinsant read the handwritten statement "very carefully" to the defendant and the defendant agree that the statement was an accurate representation of what he had said to the agent. Deputy Farmer then signed the statement as a witness. Deputy Farmer said that after the defendant signed the statement, he turned to Deputy Farmer and said, "'Well, Don, everybody makes a mistake.'"

The trial court deemed the statement voluntarily given and denied the defendant's motion to suppress.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issue in the present appeal with these standards in mind.

The record establishes that the defendant voluntarily submitted to the agent's questioning, arriving of his own accord at the jail, and that he signed a waiver of his rights before providing the statement. The defendant acknowledges that the statement is at least partially his own and that he made most of the admissions contained therein to Agent Vinsant. His only argument is that the Agent misconstrued the nature of his admissions and that some of the admissions were inconsistent with other trial testimony. This claim, even if true, would not affect the voluntariness of the statement. Instead, the defendant's claim that the statement as written by Agent Vinsant did not accurately convey the precise meaning of his admissions and that those admissions were not consistent with some trial testimony would go to the weight of the statement as evidence rather than its admissibility. *See State v. Michael Virga*, No. M2008-00209-CCA-R3-CD, slip op. at 12 (Tenn. Crim. App., Nashville, Mar. 3, 2009) ("The accuracy of a statement is not a ground on which to make a motion to suppress. Such an issue speaks to the weight of the evidence, and, as explained above, we will not re-weigh or re-evaluate the evidence presented before the trial court.") Consequently, the trial court did not err by refusing to suppress the statement. The defendant questioned Agent Vinsant regarding the perceived discrepancy and argued to the jury that the agent had misconstrued his words. He is entitled to nothing else.

### III. Sentencing

Finally, the defendant contends that the trial court erred by ordering partially consecutive sentences. The State submits that the sentence was appropriate.

"[A]lthough the statutory language continues to describe appellate review as de novo with a presumption of correctness," the 2005 revisions to the Sentencing Act "effectively abrogated the de novo standard of appellate review." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Observing that a change in our standard of review was necessary to comport with the holdings of the United States Supreme Court, our supreme court "adopt[ed] an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and

-11-

principles of our Sentencing Act." *Id.*

Despite the new standard of review, trial courts must still consider the principles of sentencing enumerated in Code section 40-35-210(b), *see Bise*, 380 S.W.3d at 698 n.33 (citing T.C.A. § 40-35-210(b)), 706 n.41, and must, as required by statute, the consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5). The court cautioned that, despite the wide discretion afforded the trial court under the revised Sentencing Act, trial courts are "still required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

The trial court applied enhancement factors (7), that "[t]he offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement," *see* T.C.A. § 40-35-114(7), and (14), that "[t]he defendant abused a position of . . . private trust . . . in a manner that significantly facilitated the commission or the fulfillment of the offense," *see id.* § 40-35-114(14), to enhance each individual sentence to nine years. Interestingly, the trial court noted that enhancement factor (7) was "somehow incumbent upon the crime itself" and that, as a result, that factor was entitled to little weight. As a matter of law, however, the trial court should not have applied factor (7) at all. Code section 40-35-114 explicitly prohibits the use of enhancement factors that are "already an essential element of the offense," *see id.* § 40-35-114, and a conviction of aggravated sexual battery requires proof that the defendant committed the touching "for the purpose of sexual arousal or gratification," *see id.* § 39-13-501(6). That being said, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d 706. Because the trial court otherwise complied with the Sentencing Act when imposing the nine year sentences, those sentences must be affirmed.

The Sixth Amendment considerations attendant to the trial court's imposition of sentence length are not implicated by the trial court's decision regarding alignment of sentences. *See Oregon v. Ice*, 555 U.S. 160, 172 (2009); *State v. Allen*, 259 S.W.3d 671, 688 (Tenn. 2008) (ruling Sixth Amendment *Blakely* challenges inapplicable to consecutive sentencing). Consequently, our standard of review when considering challenges to the alignment of sentences remains de novo with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006); *see also id.* § 40-35-401(a) ("The defendant in a criminal case may appeal from the length, range or manner of service of the sentence imposed by the sentencing court. The defendant may also appeal the imposition of consecutive sentences."). The presumption of correctness afforded the trial court is

conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *See State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely de novo. *See id.*; *see also Bise*, 380 S.W.3d at 705 ("Although nothing in the statute requires that the presumption of correctness be conditional, if trial courts fail altogether to place on the record any reason for a particular sentence, the appellate courts would be forced to conduct a de novo review.")

When a defendant is convicted of multiple crimes, the trial court may order the sentences to be served consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Code section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences:
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while

-13-

on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). The existence of a single category is sufficient to warrant the imposition of consecutive sentences. *See State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997).

The operative language of Code section 40-35-115(b)(5) originated in *State v. Taylor*, and was later codified in the 1989 Sentencing Act. In *Taylor*, our supreme court cautioned "that consecutive sentences should not routinely be imposed in sexual abuse cases . . . and that the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." *State v. Taylor*, 739 S.W.2d 227, 230 (Tenn. 1987). Similarly, the Sentencing Act provides that "[e]very defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1). Moreover, Code section 40-35-103 provides that sentences "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4). In *Gray v. State*, our supreme court held that consecutive sentencing should only be imposed after a finding that extended confinement "is necessary to protect the public from further criminal conduct by the defendant." *Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976). The holding in *Gray*, like that in *Taylor*, was later codified in the 1989 Act.

Here, the trial court ordered counts one, three, four, seven, eight, and nine to be served consecutively and counts two, five, six, and 10 to be served concurrently, for a total effective sentence of 54 years, based upon its finding that the defendant committed more than two sexual offenses against a minor. The trial court noted that after weighing "the relationship between the defendant and the victim, the time span of the defendant's undetected sexual activity, and the nature and scope of the sexual acts," some of the counts should be served consecutively. The court also observed that "whether or not evidence of manifested mental damage is existent, this young girl has been through a great, great deal." The court stated that it did not consider the psychosexual report when imposing the sentence.

Because the trial court considered appropriate sentencing principles and made statutorily required findings before imposing consecutive sentences and because the record supports those findings, the aggregate term must be affirmed.

*Conclusion*

The evidence was insufficient to support the defendant's conviction of

aggravated sexual battery in count six, and, as a result, that conviction must be reversed and the charge dismissed.  Because the trial court ordered count six to be served concurrently to counts one, two, and five, the dismissal of the conviction does not alter the total effective sentence.  The judgments of the trial court, including the imposition of partially consecutive sentencing, are affirmed in all other respects.

_____
JAMES CURWOOD WITT, JR., JUDGE